IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Donna Marie Laniewski           :

    Plaintiff                   :

    v.                          : Case No. 3:14-CV-1594

Commissioner of SSA

                           : (Judge Richard P. Conaboy)

    Defendant.                  :

_____

**Memorandum**

We consider here the appeal of Plaintiff Donna Marie Laniewski ("Plaintiff" or "Laniewski") from the decision of the Social Security Administration ("SSA") denying application for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI)".  The issues have been briefed by the parties (Docs. 21, 22, and 23) and are ripe for disposition.

**I.   Background.**

    **A.   Procedural Background.**

In July of 2012, Plaintiff filed applications for DIB and SSI with the SSA.  Plaintiff's claims were denied at the administrative level on October 18, 2012.  Plaintiff's application was then considered by an administrative law judge (the "ALJ") who conducted a hearing on the matter on August 6, 2013.  The ALJ issued a decision denying benefits on August 20, 2013 whereupon the Plaintiff requested a review of that decision by the Appeals

1

Council.  The Appeals Council denied Plaintiff's request on April 23, 2014 and thus rendered the ALJ's decision the final decision of the agency.  Plaintiff filed his appeal with this Court on August 14, 2014.  The Court has jurisdiction over this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

**B.    Testimony Before the ALJ.**

Plaintiff Laniewski testified as follows.  She is a resident of Scranton, Pennsylvania.  (Doc. 1, ¶ 5).  She was born in 1963 and was 49 years old on the date of her hearing.  (R.51).  She alleges an onset date of January 1, 2009 for both her DIB and SSI claims.  (R.45-47).

Plaintiff has a high school education and an associate's degree in Human Services.  (R.52).  She last worked in November of 2012 as a home health aide for a mentally handicapped person. (R.53-54).  From January of 2009 (her disability onset date) through November of 2012 she worked for both Allied Services and an organization called EIHAB supervising "high functioning" mentally handicapped persons who would visit Plaintiff in her home.  (R.54). She essentially functioned as a sort of personal supervisor (Id.). Her role was simply to direct these persons in their daily activities regarding hygiene or their household finances.  (R.56). Plaintiff's earnings between 2009 and 2012 were insignificant. (R.54).

From 1984 through 2006, Plaintiff had worked for the

2

Association of Retarded Citizens ("ARC") as a program specialist in charge of three group homes. (R.57). In her capacity as a program specialist she would supervise other workers to insure that the clients attended their medical appointments and have "all that they needed." (R.57). Her work as a program specialist with ARC involved traveling to different group homes but did not require her to do anything of a physical nature in terms of restraining the clients. (Id.). Her employment with ARC ended in 2006 when she was terminated after a "tiff" with her superior. (R.59-60).

From the time Plaintiff stopped working for ARC through 2010 she worked for indeterminate periods of time at the previously described positions with Allied Services and EIHAB and also in a more physically demanding job as a health aide at Moses Taylor Hospital for approximately one month. (R.60-61). Some of this work postdated her alleged onset date but was sporadic and did not result in significant earnings. (R.61).

Testimony was also taken from Joe Keating, a vocational expert. Mr. Keating was asked to respond to a series of hypothetical questions posed by the ALJ. The first of these hypothetical questions asked Mr. Keating to assume a person the same age as the Plaintiff with similar education and work experience who could: (1) occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds; (2) stand/walk for up to six hours in an eight hour work day; (3) sit

3

for at least six hours in an eight hour work day; (4) occasionally kneel, crouch, crawl, balance, and stoop; (5) occasionally use ramps and climb stairs; (6) never climb on ladders, ropes, or scaffolds; (7) occasionally use her right leg for pushing and pulling such as in the operation of foot pedals or controls; (8) never be exposed to slippery conditions or moving machinery; and (9) perform unskilled work involving simple routine tasks. Given these limitations, Mr. Keating testified that Plaintiff could not perform any of her past relevant work. (R.76-77). Mr. Keating testified that, assuming the limitations imposed by the ALJ's first hypothetical question, Plaintiff could perform jobs available in the northeastern Pennsylvania region such as housekeeper, tagger, or packer. Mr. Keating stated that each of these jobs would be classified as "light-unskilled". (R.77).

Mr. Keating next responded to a revised hypothetical question that assumed all limitations of the first hypothetical with these modifications: (1) the ability to lift/carry no more than 10 pounds; and (2) the ability to stand/walk no more than two hours in an eight hour work day. On the basis of these revisions, Mr. Keating testified that such an individual would be capable of performing sedentary level work as a surveillance monitor or assembler of small products.

The ALJ's third and final hypothetical question asked the vocational expert to assume additional limitations including: (1)

4

that the individual's pain coupled with potential side effects of her medication and bouts of depression would cause her to be off task up to 20 percent of the time; and (2) that the individual would miss work entirely or be unable to complete her shift two or more days each month.  The vocational expert responded that these additional limitations would render an individual incapable of any substantial gainful employment.  (R.78).

### C.   Physical and Mental Impairment Evidence.

The medical evidence establishes that Plaintiff has treated for cervical radiculopathy, lumbar disc disease, anxiety, depression, chronic pain, bi-lateral leg pain with radiculopathy and shooting pain down her right leg, neuropathy, and herniated disc at L4-L5.  The treatment for these conditions was provided by several different physicians.  Her treatment history with these physicians is catalogued below as is the evaluations of her conditions rendered by several consulting physicians.

### 1.   Dr. Paul Horchos.

The record disclosed that Plaintiff treated extensively with Dr. Paul Horchos from January of 2004 to November of 2008.  Dr. Horchos saw Plaintiff initially on January 7, 2004.  His office notes of that visit reflect an EMG/Nerve Conduction Study performed on July 19, 2003 which revealed a C5-C6 radiculopathy.  His examination of that date revealed that Plaintiff was experiencing muscular spasm over her left shoulder and left occipital region as

well as numbness and tingling from the left elbow to the left
thumb.  Dr. Horchos' impression at that time was that Plaintiff
suffered from a likely cervical disc herniation at C4-C5, C3-C4
level and left occipital neuralgia.  (R.300-301).

Dr. Horchos next saw Plaintiff on January 22, 2004.  His
office notes on that occasion reflect an MRI scan of January 13,
2004 that revealed a cervical disc protrusion at C6-C7 with the
electrophysiological evidence of C6 radiculopathy.  (R.291).  Dr.
Horchos ordered an epidural steroid injection using a left C6-C7
transforaminal approach for muscular spasm relief.

On March 4, 2004, Dr. Horchos saw Plaintiff in follow-up to
the aforementioned transforaminal epidural steroid injection "which
really hasn't seemed to make much effect on her overall condition."
In light of Plaintiff's EMG Nerve Conduction Study, Dr. Horchos
considered a repeat epidural injection.  He decided, however, to
prescribe physical therapy with cervical traction first.

Plaintiff returned to Dr. Horchos on April 2, 2004 complaining
of right shoulder, neck, and arm pain which had been present for
four to six weeks.  Dr. Horchos noted that cervical traction seemed
to ease her pain which "subjectively and objectively" radiated down
Plaintiff's right arm toward her thumb along the lateral border of
the right forearm and hand.  Dr. Horchos diagnosed cervicalgia with

possible cervical disc herniation at C6 level. [1] Dr. Horchos prescribed Neurontin to be taken in combination with oral steroids that had been prescribed by another physician. (R.288-289).

Dr. Horchos next examined Plaintiff on April 21, 2004. She stated at that time that the Neurontin was helpful in reducing the radicular pain in her right arm. Dr. Horchos discontinued the Neurontin at this time and directed Plaintiff to take a low dose of Hydrocodone two to three times a day. Dr. Horchos noted that, while Plaintiff's pain had lessened, she was looking forward to an epidural steroid injection that she was about to have. Dr. Horchos' impression continued to be right C6 radiculitis, with right rotator cuff tendinitis, and AC joint disputation. [2] (R.286-87).

On May 12, 2004, Dr. Horchos again saw the Plaintiff. At that time, he noted a significant improvement in Plaintiff's pain level as a result of a right cervical epidural steroid injection. Dr. Horchos stated "I am encouraged that her function is improving but

---

[1] Cervicalgia is neck pain that occurs toward the rear of side of the cervical vertebrae. It generally is felt as discomfort or as a sharp pain in the neck, upper back or shoulders. The term cervicalgia covers a broad range of neck pain causes, including whiplash, muscle strain, ligament sprain, and inflammation of the neck joints. It also can be caused by a number of abnormalities in the region of the cervical vertebrae, including a bulging disc, a pinched nerve, narrowing of the spinal canal (stenosis), spinal arthritis or degenerative disc disease. www.laserspineinstitute.com/back_problems/neck_pain/overview/cervicalgia.

[2] The "AC" joint is a joint in the shoulder where the collar bone or clavicle meets the shoulder blade or scapula. The portion of the shoulder blade which meets the clavicle is called the acromion. As a result the meeting point of these two structures is called the AC joint. www.hopkinsortho.org/ac_joint.html.

I am not 100% positive that it is going to remain this way."
(R.284-85).  This improvement continued through August 27, 2004.
(R.283).

Dr. Horchos again examined Plaintiff on January 20, 2005 at
which time he documented an exacerbation of her C6 radiculopathy on
the right side with attendant paraspinal muscle spasms involving
the thoracic spine and periscapular musculature.  Dr. Horchos
prescribed myofascial massage and Vicodin ES for Plaintiff's pain
and spasms.  (R.281-82).

From January of 2005 through November of 2008, Dr. Horchos
examined Plaintiff on no fewer than 15 occasions.  Dr. Horchos'
notes from these sessions continue to reveal a cervical
radiculopathy and paraspinal muscle spasms ebbing and flowing
throughout that 22 month time frame.  On November 25, 2008, Dr.
Horchos noted that Plaintiff's cervical radiculopathy was
reasonably stable with continued use of pain medication.  (R.263-
280).

**2.  Dr. Charles Manganiello.**

On January 28, 2010, Plaintiff began treating with Dr. Charles
Manganiello.  At that time, Dr. Manganiello found that Plaintiff
was experiencing: (1) lumbar disc disease with right lower
extremity radiculopathy; (2) chronic knee pain secondary to a
previous ligament tear; and (3) chronic-non-malignant pain.  Dr.
Manganiello elicited a positive straight leg raise on Plaintiff's

8

right side and noted decreased range of motion of the lumbar spine with spasm and tenderness of the paralumbar musculature.  He prescribed Vicodin and determined to follow her and "intervene accordingly".  (R.317).

Dr. Manganiello next saw Plaintiff on May 27, 2010.  At that time, she presented with neck pain, low back pain, and arm and leg discomfort.  Plaintiff was positive bilaterally in terms of her straight leg raise and had slight weakness in her right leg.  Dr. Manganiello's assessment was lumbar disc disease with right lower extremity radiculopathy, cervical disc disease, progressive and chronic-non-malignant pain.  Plaintiff was continued on Vicodin. (R.316).

Plaintiff next presented to Manganiello on November 24, 2010. Dr. Manganiello's office notes for that visit state:  "She continues with pain related to cervical and lumbar disc disease. She is very depressed about her problems."  Once again, her straight leg raise was positive bilaterally.  Her diagnoses were static with an additional assessment of depression. Dr. Manganiello continued Plaintiff on Vicodin and added Paxil to combat depression.  (R.315).

On May 25, 2011, Dr. Manganiello again examined Plaintiff. Her lumbar disc disease with attendant right leg radiculopathy continued and he also assessed "anxiety/depression".  Dr. Manganiello increased Plaintiff's Paxil dosage and also prescribed

9

Xanax.   For her physical pain, Dr. Manganiello discontinued Vicodin and substituted Norco. [3] (R.314).

On February 24, 2012, Dr. Manganiello saw Plaintiff once again.  At that time, he reiterated his previous diagnoses and noted for the first time that her weight "is a problem" and that "she has her pain and deficits in function."  Once again, her straight leg raise test was positive.  (R.313).

Plaintiff next presented to Dr. Manganiello on August 31, 2012.  Dr. Manganiello's office notes of that visit continued to indicate depression, lumbar disc disease, and chronic non-malignant pain.  His office notes also indicate that Plaintiff was "crying and carrying on" about her pain and the recent death of her boyfriend.  Dr. Manganiello also noted: "Swelling of her legs distally neurologic changes as before.  Changes about her low-back and legs with straight leg raising being positive.  She is tender about her legs.  Just touching her legs causing her pain."  Dr. Manganiello's prognosis was that Plaintiff remained disabled and he scheduled an MRI of Plaintiff's lumbo-sacral spine.  (R.354).

The MRI of the lumbar spine ordered by Dr. Manganiello was conducted on September 7, 2012 by Dr. Molly McGinley.  Dr. McGinley's assessment of the Plaintiff's MRI indicated a "bulging disc with disc dessication at L3-L4," a "superimposed moderate

---

[3] Norco is a combination of acetaminophen and hydrocodone.  Hydrocodone is an opioid pain medication.  Norco is used to relieve moderate to severe pain and is potentially addictive. www.drugs.com/norco/html.

right paracentral disc herniation" at L4-L5, and a "right
asymmetric disc bulge at L5-S1."  Dr. McGinley's impression
included an admonition to potential treating physicians: "Please
refer to numbering scheme of this examination prior to any planned
intervention."  (R.353).

Plaintiff's last session (at least as recorded on the record)
with Dr. Manganiello was on April 3, 2013.  Dr. Manganiello's
office notes of that session state:

> She has pain radiating down her leg.  MRI is
> consistent with a significant herniated L4-L5 disc.
> She takes analgesics for treatment of the same.  She
> is significantly depressed.  She cries throughout
> her entire evaluation because of her inability to
> function and care for herself.  She takes Paxil,
> Xanax, and Norco.  The only problem with her Norco
> is that she would like to take it every four hours
> rather than six hours.

Dr. Manganiello also noted lumbar pain, and weakness in both legs
with the right leg worse than the left leg.  His assessment was
lumbar disc disease with radiculopathy in the right leg and
depression.  His prognosis stated: "She needs to apply for
disability.  She needs to be seen by psych., pain management and

neurosurgery.  She has no insurance and states that she cannot afford the intervention." Dr. Manganiello adjusted her Norco dosage to every four hours as needed and indicated that she should return in four to six months.  (R.351).

On June 3, 2013, Dr. Manganiello completed a Residual Functional Capacity Questionnaire regarding Plaintiff Laniewski. He found, once again, that she suffered from lumbar disc disease and stated that her prognosis was poor for recovery.  He stated that her symptoms included both low back pain and leg pain and weakness.  Dr. Manganiello indicated that her symptoms from these impairments was constant and would interfere with her concentration to perform even simple work-related tasks.  He identified drowsiness and weakness as side-effects of her prescribed medications.  Dr. Manganiello also indicated: Plaintiff could walk less than on block without rest or significant pain; Plaintiff could sit no more than two hours in an eight hour workday; Plaintiff could stand or walk no more than two hours in an eight hour workday; Plaintiff would require work that would permit her to shift position at will; Plaintiff would need to take up to 16 unscheduled breaks in the course of an eight-hour workday; Plaintiff could lift or carry no more than ten pounds occasionally and could never lift anything in excess of ten pounds; Plaintiff would miss more than four days of work per month; and that Plaintiff was not a malingerer.  (R.360).

12

### 3.   Dr. Jay Willner.

On September 29, 2012, Plaintiff was seen by Dr. Jay Willner at the request of the Bureau of Disability Determination.  This session was a one-time consultative examination.  Dr. Willner recorded Plaintiff's height as 5'2" and her weight as 235 pounds. These findings add credence to Dr. Manganiello's previously mentioned observation that Plaintiff's obesity added to her physical impairments.  Dr. Willner's other observations regarding Plaintiff include: (1) bilateral lower leg edema from the ankles to the knees; (2) moderate difficulty walking; (3) unstable gait; (4) full range of motion of cervical spine with associated pain; (5) full range of motion of the lumbar spine with associated pain; (6) allodynia of her right leg;[4] (7) numbness of her lateral right thigh and calf; (8) degenerative disc disease; and (9) tearful and aggressive mood that may support a diagnosis of depression.  Dr. Willner reached these conclusions without benefit of the MRI conducted by Dr. McGinley on September 7, 2012 that indicated disc herniation at L4-L5 and a bulging disc at L5-S1.  Dr. Willner's observations are generally consistent with those of Plaintiff's treating physicians over the years.[5]  Dr. Willner did not complete

---

[4] Allodynia is pain due to a stimulus that does not ordinarily provoke pain.  It is a prominent symptom in patients with neuropathic pain.  Neuropathic pain is pain resulting from a lesion or disease of the peripheral or central nervous system.  www.ncbi.nlm.nih.gov.

[5] The ALJ noted that Dr. Willner's assessment was consistent with that of Plaintiff's treating physicians. (R.36-37).

a Residual Functional Capacity Questionnaire regarding the
Plaintiff.  (R.337-343).

### 4.   Drs. Tedesco and Vizza.

On October 16, 2012, Plaintiff's records were reviewed by Dr.
James Vizza for the purpose of a Disability Determination
Explanation to assess the Plaintiff's level of mental impairment.
(R.80-86).  On October 17, 2012, Plaintiff's records were reviewed
by Dr. Louis Tedesco to assess Plaintiff's level of physical
impairment.  (R.86-89).  Neither Dr. Vizza nor Dr. Tedesco had
access to Dr. McGinley's MRI establishing Plaintiff's herniated
disc at L4-L5 and bulging disc at L5-S1.  Neither Dr. Vizza nor Dr.
Tedesco had the benefit of Dr. Manganiello's Functional Capacities
Evaluation because that document had not yet been prepared at the
time they reviewed Plaintiff's medical records.  Neither Dr. Vizza
nor Dr. Tedesco examined the Plaintiff.  Nevertheless, as often
happens in Social Security cases, both Dr. Vizza and Dr. Tedesco
concluded that, while claimant's complaints were partially
credible, the evidence of record was insufficient to support an
award of benefits.  Dr. Tedesco went so far as to opine that this
5'2", 235 pound woman with, as he himself indicated, discogenic and
degenerative back disorders (severe), peripheral neuropathy
(severe), affective disorders (non-severe), and anxiety disorders
(non-severe) could: (1) occasionally lift/carry up to 20 pounds;
(2) frequently lift/carry 10 pounds; (3) stand/walk up to six hours

in an eight hour day; (4) sit up to six hours in an eight hour day;
and (5) occasionally climb stairs and ladders, frequently bend at
the waist, and occasionally kneel, crouch, and crawl.

**D.   ALJ Decision.**

The ALJ's decision (Doc. 18-2) was unfavorable to the
Plaintiff.  It included the following findings of fact and
conclusions of law:

> (1)   The claimant meets the insured status
>        requirement of the Social Security Act through
>        December 31, 2016.
>
> (2)   The claimant has not engaged in substantial
>        gainful activity since January 1, 2009, the
>        alleged onset date.  (20 CFR 404.1571 et seq.,
>        and 4016.971 et seq.).
>
> (3)   The claimant has the following severe
>        impairments:  degenerative disc disease of the
>        lumbar spine and depression (20 CFR 404.1520(c)
>        and 416.920(c)).
>
> (4)   The claimant does not have an impairment or
>        combination of impairments that meets or
>        medically equals the severity of one of the
>        listed impairments in 20 CFR Part 404, Subpart
>        P Appendix 1 (20 CFR 404.1520(d), 404.1525,
>        404.1526, 416.920(d), 416.925 and 416.926).

(5)   After careful consideration of the entire
      record, the undersigned finds that the claimant
      has the residual functional capacity to perform
      light work as defined in 20 CFR 404.1567(b) and
      416.967(b) except the claimant could
      occasionally kneel, crawl, crouch, balance and
      stoop.  The claimant could occasionally use
      ramps and climb stairs but should avoid
      occupations requiring climbing on ladders,
      ropes or scaffolds.  The claimant could
      occasionally use her right lower extremity for
      pushing or pulling, such as with the operation
      of pedals or foot controls.  The claimant must
      avoid concentrated exposure to vibration, wet
      or slippery conditions and hazards, such as
      unprotected heights and moving machinery.  The
      claimant is able to perform unskilled work
      involving simple, routine tasks.

(6)   The claimant is unable to perform any past
      relevant work (20 CFR 404.1565 and 416.965).

(7)   The claimant was born on October 5, 1963 and
      was 45 years old, which is defined as a younger
      individual age 18-49 on the alleged disability
      onset date.  (20 CFR 404.1563 and 416.963).

(8)  The claimant has at least a high school
     education and is able to communicate in English
     (20 CFR 404.1564 and 416.964).

(9)  Transferability of job skills is not material
     to the determination of disability because
     using the Medical Vocational Rules as a
     framework supports a finding that the claimant
     is "not disabled," whether or not the claimant
     has transferable job skills (See SSR 82-41 and
     20 CFR Part 404, Subpart P, Appendix 2).

(10) Considering the claimant's age, education, work
     experience, and residual functioning capacity,
     there are jobs that exist in significant
     numbers in the national economy that the
     claimant can perform.  (20 CFR 404.1569,
     404.1569(a, 416.969, and 416.969(a)).

(11) The claimant has not been under a disability,
     as defined in the Social Security Act, from
     January 1, 2009 through the date of this
     decision (20 CFR 404.1520(g) and 416.920(g)).

## II.  Disability Determination Process.

The Commissioner is required to use a five-step analysis to

determine whether a claimant is disabled.[6]   It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.   20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.   The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.   If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person

---

[6]   "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

18

with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R.38-39).

## III.  Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel
> non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality

19

> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See Cotter*, 642 F.2d at 706
> ("Substantial evidence" can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are

20

rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported

by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  See, e.g., Albury v. Commissioner of Social Security, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing Burnett v. Commissioner, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir. 2001).

## IV.  Discussion.

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits.  See Dobrowolsky, 606 F.2d at 406.  Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides

an applicant with assistance to prove his claim.  Id.  "These
proceedings are extremely important to the claimants, who are in
real need in most instances and who claim not charity but that
which is rightfully due as provided for in Chapter 7, Subchapter
II, of the Social Security Act."  Hess v. Secretary of Health,
Education and Welfare, 497 F. 2d 837, 840 (3d Cir. 1974).  As such,
the agency must take extra care in developing an administrative
record and in explicitly weighing all evidence.  Dobrowolsky, 606
F.2d at 406.  Further, the court in Dobrowolsky noted "the cases
demonstrate that, consistent with the legislative purpose, courts
have mandated that leniency be shown in establishing the claimant's
disability, and that the Secretary's responsibility to rebut it be
strictly construed."  Id.

**B. Plaintiff's Allegations of Error.** [7]

1.   **Whether the ALJ Erred in Weighing the Opinion Evidence
     Proffered by Treating Physician Charles Manganiello and,
     Accordingly, Erred in his Assessment of Plaintiff's
     Residual Functional Capacity?**

Plaintiff argues that the opinion evidence offered by treating
physician Charles Manganiello, M.D., was improperly subordinated to
the opinion of Dr. Louis Tedesco, a physician who merely reviewed

---

[7] Plaintiff actually has made five specific allegations of error.  Four of these coalesce into the two allegations of error discussed here.  The fifth - - the allegation that Plaintiff met the specific criteria of Listing 1.04 - - is rejected because the Court cannot conclude from the record that this is so.

some of Plaintiff's medical records at the request of the SSA.
Plaintiff states (Doc. 21 at 6) correctly that "a cardinal
principle guiding disability eligibility determinations is that an
ALJ [must] accord treating physicians' reports great weight,
especially when their opinions reflect expert judgment based on a
continuing observations of the patient's condition over a prolonged
period of time."  Morales v. Apfel, 225 F.3d 310, 317 (3d. Cir.
2000).  It is equally true, as Plaintiff's counsel acknowledges
(Id.), that an ALJ may reject the medical judgment of a treating
physician when contradictory medical evidence exists.  However,
that contradictory medical evidence must be based upon objective
findings which must, in turn, be explained insofar as they deviate
from the treating physician's conclusions.  The ALJ's decision in
this case relies improperly on the report of a non-treating
physician who offered his opinion without benefit of critically
important evidence in this record.

The critically important evidence to which the Court alludes
is the MRI performed by Dr. Molly McGinley on September 7, 2012
(R.353).  That MRI, which constitutes reliable objective medical
evidence, clearly indicates that Plaintiff suffered from a
herniated disc at L4-L5 as well as bulging discs at L3-L4 and L5-
S1.  Because Dr. Tedesco was unaware of Plaintiff's MRI result, [8]

---

[8] The records reviewed by Dr. Tedesco (R.80-89) do not include the MRI and Dr. Tedesco's
Residual Functional Capacity Assessment demonstrates no awareness of the MRI results.

the totality of his appraisal of Plaintiff's physical capacities is called into question.  The Court is struck by the fact that Dr. Manganiello, Plaintiff's treating physician, who had the advantage of continually observing claimant's condition over a prolonged period of time (as discussed in Morales, supra) and who also had the benefit of the MRI result, was clearly in a superior position to opine regarding Plaintiff's residual functional capacity.

The ALJ's preference for Dr. Tedesco's evaluation is based upon his assertion that it is entitled to "great weight because it is well-reasoned and supported by the diagnostic and clinical findings and the claimant's treatment history." (R.37).  The Court cannot agree that Dr. Tedesco's report was supported by the diagnostic and clinical findings when the results of a highly relevant diagnostic test (the MRI) performed on the Plaintiff had never been reviewed by him. To blithely close its eyes to this deficiency would be tantamount to this Court participating in the type of sham proceeding explicitly forbidden in the Third Circuit by Kent v. Schweiker, supra.  Consequently, the Court finds that the ALJ improperly subordinated Dr. Manganiello's opinion to that of Dr. Tedesco when it is apparent that the latter did not consider all the diagnostic testing in the record in forming his opinion regarding Plaintiff's physical limitations.  Concomitantly, the ALJ's reliance upon Dr. Tedesco in formulating his assessment of the Plaintiff's residual functional capacity is equally unreliable.

25

**2.    Whether the ALJ's Determination that Plaintiff's Complaints of Pain are Only Partially Credible is Supported by Substantial Evidence of Record?**

Upon identifying an underlying medical impairment that could reasonably be expected to produce a claimant's pain and other symptoms, the ALJ must evaluate the intensity of the Plaintiff's pain and other symptoms.  20 C.F.R. § 404.1529(c).  Here, the ALJ has determined that the Plaintiff's medically determinable impairments include "degenerative disc disease of the lumbar spine".  (R.30).  The ALJ also acknowledges that "the claimant's medically determinable impairments ... could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  (R.34).  Having examined the ALJ's decision carefully, those reasons appear to be confined to the fact that "the objective medical evidence, diagnostic and clinical findings and rather conservative treatment is not consistent with the level of limitations alleged by the claimant."  (R.35).

The objective medical evidence and diagnostic testing in this record support the fact that Plaintiff suffers from degenerative disc disease, bulging discs, a herniated disc, and associated radiculopathy.  Thus, the Court simply cannot agree that "the

26

objective medical evidence and diagnostic and clinical findings" do not support Plaintiff's account of her pain level and physical limitations.  We are thus left with Plaintiff's "rather conservative treatment" as a basis for accepting her complaints of pain and physical restrictions as only "partially credible".

The Court notes that Plaintiff treated with Dr. Manganiello for approximately 34 months during which she saw him no fewer than seven time.  It is true that he treated her physical injuries conservatively with various pain medications for much of that time.[9]  Nonetheless, we do not view his conservative treatment of Plaintiff as a reasonable basis for the conclusion that her complaints of pain were less than fully credible.  It has been held that "even pain unaccompanied by objectively observable symptoms which is nevertheless real to the sufferer and is so intense as to be disabling will support a claim for disability benefits." Taybron v. Harris, 667 F.2d 412, 415 (3d. Cir. 1981). Linked, as they are, to diagnostic testing indicating conditions that might be expected to produce the type and level of pain Plaintiff alleges, Plaintiff's complaints of pain are entitled to great weight. Ferguson v. Schweiker, 765 F.2d 31, 37 (1985).  Where, as here, the only contradictory medical testimony seems to be the evaluation of a physician who reviewed some, but not all, of Plaintiff's

---

[9] However, after seeing the results of the aforementioned MRI, Dr. Manganiello expressed the need for Plaintiff to see a pain management physician and a neurosurgeon.  (R.351).

27

treatment records, the ALJ must be more specific in describing what diagnostic and clinical findings he relied upon to justify his rejection of the Plaintiff's complaints of pain and conclusions of a longtime treating physician.

**V.   Conclusions.**

For the reasons discussed above, the Court concludes that the Acting Commissioner's decision to deny benefits in this case is not supported by substantial evidence as required by Richardson, Cotter, and Dobrowolsky, supra.  Accordingly, this case will be remanded to the SSA for a re-evaluation of the totality of the medical evidence and a more detailed explanation of why the Plaintiff's complaints of pain were viewed as less than fully credible.  An Order consistent with the foregoing Memorandum follows.

BY THE COURT

<u>Richard P. Conaboy</u>
Honorable Richard P. Conaboy
United States District Court

Dated: May 12, 2015